**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AUREA ORTIZ,** | : | **Civil No. 3:23-CV-1020** |
| **o/b/o B.C.B.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **(Magistrate Judge Carlson)** |
| **v.** | : | |
| | : | |
| **MARTIN O'MALLEY,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

The Social Security Act provides a social safety net for children who face profoundly disabling physical or emotional impairments but, in order to qualify for these benefits, a child must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner has interpreted this statutory provision in regulations which provide

---

[1]    Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

that a child whose condition meets, or medically or functionally equals, the criteria of a listed impairment must be found disabled. 20 C.F.R. § 416.924(a). When determining this issue of childhood disability, there are six domains of functioning which an Administrative Law Judge (ALJ) must consider: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving about and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). In order to establish disability, an ALJ must conclude that a child exhibits either a "marked" limitation in two of these six domains, or an "extreme" limitation in any single domain. 20 C.F.R. § 416.926a(d).

Once a childhood disability determination has been made, the Supreme Court has underscored for us the limited scope of our substantive review of that decision on appeal, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks

2

omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The plaintiff, Aurea Ortiz, appeals from an adverse decision of the Commissioner of Social Security denying her minor grandson, B.C.B.'s, application for Supplemental Security Income (SSI) under the Social Security Act. On appeal, the plaintiff challenges the ALJ's decision, arguing that it was not supported by substantial evidence. However, after a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Accordingly, for the reasons set forth below, the decision of the Commissioner will be affirmed.

## II.    **Statement of Facts and of the Case**

On February 19, 2019, Aurea Ortiz applied for supplemental security benefits on behalf of her minor grandson, B.C.B., alleging an onset of disability in February of 2019. (Tr. 50). B.C.B. was born in March of 2009 and was nine years old at the time of this disability application. (Tr. 51).

3

In assessing whether B.C.B. suffered from marked or extreme impairments in any of the six domains of functioning which an Administrative Law Judge (ALJ) must consider, 20 C.F.R. § 416.926a(b)(1)(i)-(vi), the ALJ was presented with an academic and clinical record which revealed that, aside from the normal symptoms of B.C.B.'s attention deficit hyperactivity disorder (ADHD) and learning disorder, which were being addressed through an IEP at his school, the bulk of his behavioral problems were situational and were exhibited exclusively in the home setting.

B.C.B.'s academic records revealed that for the most part, B.C.B. attained passing grades in his classes, though he struggled with math and reading. (Tr. 471-515). His teachers observed that he was smart with good attendance but that he lacked stamina and motivation to complete work, had poor organization and preparedness for class and poor reading and writing skills. (Tr. 99-100). But B.C.B's fourth grade teacher completed an evaluation noting he had no problems in the domains of attending and completing tasks, interacting and relating with others, and moving about and manipulating objects, and caring for himself, but in the area of acquiring and using information he had problems functioning, including obvious problems in reading and comprehending written material, comprehending and doing math problems, providing organized oral explanations and adequate descriptions, expressing ideas in written form, learning new material, and applying problem-

4

solving skills in class discussions. (Tr. 385-92). She noted no unusual degree of absenteeism. (Tr. 385). In October 2019, B.C.B.'s fifth grade teacher completed an evaluation which indicated he often exhibited symptoms such as difficulty sustaining attention, was easily distracted and fidgeted and left his seat frequently, but that he was never angry, never initiated fights or was physically cruel to people or lost his temper. (Tr. 663).

B.C.B.'s standardized test scores revealed some degree of impairment on his part and were at basic or below basic levels, reflecting lower strength in academic matters, (Tr. 534), and cognitive and academic achievement testing revealed below average range of intelligence, with an IQ of 76, and low average to very low scores in all subjects of academic achievement. (Tr. 101, 105).

It was not until 2021 when B.C.B. was evaluated for an individual education plan (IEP) and provided accommodations such as extended time on tests and large assignments and seating close to the instructor. (Tr. 486). The IEP evaluation did not identify a specific learning disability, but rather noted his learning profile was consistent with his ADHD diagnosis. (Tr. 110). IEP testing in 2021 noted discrepancies in reading fluency, reading comprehension, writing, and basic math skills but noted that he exhibited no behaviors that impeded his learning or that of others, interacted well with adults, and was not defiant, oppositional, or

argumentative or easily frustrated. (Tr. 478, 516). He was noted to be cooperative at school and had a good relationship with his peers. (Tr. 486). His records through seventh grade show no disciplinary incidents. (Tr. 532-33). And B.C.B.'s school records note that B.C.B.'s grandmother reported very elevated concerns in all areas of functioning, while his teachers reported no concerns in several areas, indicating "an overly negative response style, which may be an indicator of her feeling overwhelmed with his behavior at home and wanting help for him." (Tr. 103).

Clinical counseling records also typically recorded that B.C.B's emotional impairments were generally related to his ADHD, and he primarily had behavior issues at home. An April 2018 psychological evaluation diagnosed him with unspecified disruptive, impulse-control, and conduct disorder, citing physical aggression with his family, irritability, mood disruption, anger outbursts, and oppositional defiance in the home. (Tr. 551-56). But the examiner noted that B.C.B. maintained good eye contact, normal thought process, good recent and remote memory, good mood, and appropriate speech. (Tr. 555). She noted that he was honest about his negative behaviors, alert and oriented, but with poor to fair insight and judgment. (Id.) Medication management, psychological case management, and participation in community activities was recommended. (Tr. 556)

Counseling records from 2018 indicate that B.C.B. exhibited behavior issues mostly at home and had been attending school without any issues. (Tr. 562). It was noted that he does not demonstrate behavior issues at school but refused to attend every day and had difficulty completing homework and struggled academically. (Tr. 577-79). But these notes also state that he was very respectful toward his caseworkers. (Tr. 580). He was attending an after-school program at Philhaven four days per week and stated that he liked the program and was receiving medication management and counseling. (Tr. 583)

Psychiatry notes from 2019 state B.C.B. was diagnosed with oppositional defiant disorder in 2016 and adjustment disorder with mixed disturbance of emotions and conduct and attention deficit hyperactivity disorder (ADHD) in 2017. (Tr. 587-88). Progress notes from early 2019 stated that he was compliant with medications with good focus and concentration, school was going well but that he struggled with behavioral problems at home and struggled to regulate his emotions, especially his anger. (Tr. 587-613). Throughout 2019 and early 2020 B.C.B. reported he had been doing well at home and school, listening more, attending school and that his mood, concentration, and focus had been good, but did not some instances of trouble paying attention in class. (Tr. 679, 681, 683, 685, 705, 707, 709, 716). His grandmother continued to report that he was defiant and exhibited behavioral problems at home.

(Id.) They began family-based therapy in 2020, (Tr. 703), and notes from May 2021 indicate that B.C.B. and his grandmother were working on communicating more effectively and emotional regulation. (Tr. 897-901). Examinations during 2019 and 2020 showed appropriate grooming, fair to good insight and judgment, that he was fully oriented and cooperative. (Tr. 675, 682, 684, 695, 704, 708, 710, 712, 715).

In April 2019, B.C.B. underwent a pediatric evaluation by consultative examiner NP Karena Hammon. (Tr. 625-28). Nurse Hammon noted diagnoses of asthma, learning disability, and ADHD. (Tr. 628). She noted his history of behavior problems with ADHD but that he interacted appropriately throughout the exam. (Tr. 25). She reported that he enjoyed watching TV, listening to music, and playing with friends and that he did his homework with encouragement and direction from his family and will do chores. (Tr. 626). She also noted that his grandmother reported it had been about four years since he had an asthmatic episode and did not use any inhalers. (Tr. 625).

B.C.B. also underwent a comprehensive psychiatric, intellectual, and achievement evaluation with Kathleen Lederman, Psy.D. in May 2019. (Tr. 636-42). The evaluation noted that he was receiving academic and emotional support in special education at that time, (Tr. 636), though his school records indicate he was not evaluated for an IEP until 2020 and was in regular education. B.C.B.'s family

reported to the examiner that he had angry outbursts several times a day and could be both physically and verbally aggressive to his grandmother, siblings, and other adults. (Tr. 637). It was reported that he had lying and stealing behavior and threatened to leave home. (Id.) They reported symptoms of his ADHD including inattention, problems focusing, impulsivity, and hyperactivity. He also reported depression. (Id.) The mental status examination revealed coherent and goal directed thought process, but impaired attention and concentration and mildly impaired memory, though it was noted his ADHD medication was wearing off during the evaluation. (Tr. 638). The examination also revealed borderline intellectual functioning and fair insight and judgment but cooperative and friendly behavior and did not exhibit significant emotional distress during the evaluation. (Tr. 639). As to his intellectual functioning, the examination revealed borderline intellectual ability indicating moderate deficits, with a full-scale IQ of 71. (Tr. 640). Dr. Lederman noted diagnoses of ADHD, learning disability, unspecified depressive disorder, oppositional defiant disorder, intermittent explosive disorder and recommended he continue with his current educational placement and psychological intervention therapy and treatment. (Tr. 641).

In August 2020, B.C.B. returned from a six-week trip to Puerto Rico when he was not on his medications. (Tr. 699). He denied feeling depressed but reported

9

auditory and visual hallucinations since returning from Puerto Rico. (Tr. 694, 696, 699). In September 2020 his grandmother reported that he procrastinates and avoids schoolwork but B.C.B. again reported that he had been doing his work but school had been hard for him and admitted being stressed about school. (Tr. 694). By the end of 2020, B.C.B. and his grandmother reported that he was doing better, had been attending school online which had been going well and was medication compliant and had good focus and concentration. (Tr. 809). They were working on getting him evaluated for an IEP at school and he was attending a counseling after school program. (Tr. 811). Psychiatry records throughout 2021 note B.C.B. doing well with some reports of defiance and arguing with his grandmother, but he stated he was no longer hearing voices and examination findings were overall normal. (Tr. 813-824). In 2021, B.C.B. continued participating in an after-school counseling program. (Tr. 785-808, 827-54, 863-90). It was noted that B.C.B. was working on improving his social skills and actively participated in the program and interacted appropriately with staff and peers. (Id.)

Records indicate that B.C.B. underwent a partial psychiatric hospitalization program from October 27, 2021, to November 16, 2021. (Tr. 892). His intake forms note that he had an IEP in school but that he reported no issues or concerns with academics (other than math and spelling), noted that he understood the materials but

sometimes struggled to complete homework. (Tr. 902). His family reported no concerns within the school setting until the 2021-22 school year when he began being reported for disruptive behavior. (Id.) He was exhibiting signs of depression. (Tr. 904-05). Discharge notes state that he was being treated for behavioral problems including verbal aggression, not following rules, threatening others, and not getting along with siblings and that he punched a wall and broke a mirror in the bathroom in October 2021. (Tr. 891-82). It was also noted that he struggled with personal hygiene. (Id.) However, again, these notes state that, "all behaviors/symptoms have only been demonstrated within the home setting." (Id.) His discharge notes state that he struggled to understand the DBT skills that were taught in the group room and that he was unable to recall skills, define them, and apply them to situations appropriately, impacting his ability to complete activities and apply the skills at home. (Tr. 892). B.C.B. reported having better communication with his support system and a decrease in depressive symptoms but continued to struggle with completing hygiene tasks. (Id.)

Given these academic and treatment records demonstrating that B.C.B. exhibited symptoms of ADHD and learning disability in school, but that his behavioral issues were primarily isolated to the home setting, four state agency experts who assessed B.C.B.'s impairments all agreed that he did not suffer from

marked or extreme limitations in any of these six basic realms of functioning. On May 30, 2019, State agency consultants, Dr. John Gavazzi and Dr. Chevaughn Daniel evaluated B.C.B.'s functional abilities to determine if his impairments met or equaled a listing. They opined that he had a less than marked impairment in acquiring and using information, attending and completing tasks, interacting and relating with others, and caring for himself. (Tr. 129-30) They further opined that B.C.B. had no limitations in his health and physical wellbeing and moving about and manipulating objects. (Id.) As to those areas where the consultants found less than marked limitations, they noted B.C.B. had limitations with learning new information, attention, concentration and task persistence, self-regulation and coping skills, but noted that he managed in regular education with no special education services needed at that time, and that his difficulties in attention and concentration and inappropriate and out of control behavior at home were not consistent over time and across situations. (Id.) Dr. Daniel also opined that B.C.B.'s breathing problems were under control, that he had no problems breathing for the past four years and was not using any inhalers. (Id.) On reconsideration, State agency consultants Dr. Thomas Fink and Dr. Anjana Popat similarly found that B.C.B.'s impairments did not functionally equal the listings as he had less than marked or no limitations in all areas of functioning. (Tr. 142-43).

The mental status examinations of B.C.B. conducted by Dr. Kathleen Ledermann in May of 2019, (Tr. 636-42), and NP Hammon in April of 2019, (Tr. 625-28), also failed to disclose any marked or extreme impairments. While these consultative examinations had only limited value due to the failure of the examining sources to specifically evaluate whether B.C.B. had marked or extreme impairments in any of these six realms of functioning, the reports generally indicated that B.C.B. exhibited symptoms of ADHD and learning disability, including impaired attention and concentration when his medication was wearing off, (Tr. 638), but that his thought process was coherent and goal directed, he was cooperative and interacted appropriately, was friendly, and did not exhibit emotional distress. (Tr. 625, 639). Both examiners noted a history of behavior problems associated with ADHD, and Dr. Lederman noted borderline intellectual function but fair insight and judgment. (Tr. 625, 639-40).

It was against this backdrop that the ALJ conducted a hearing in B.C.B.'s case on November 16, 2021. (Tr. 66-96).B.C.B., his grandmother, and his aunt, Rebecca Caravello, testified at this hearing. (Id.) The ALJ summarized the testimony and statements of B.C.B. and his family members as follows:

> Aurea Ortiz, the claimant's grandmother, testified and stated in the record that the claimant became disabled on February 19, 2019 due to attention deficit hyperactivity disorder, learning disability, behavioral issues, and breathing problems. She reported that the claimant had a

case manager, primary care physician, outpatient psychology and wraparound services, and Individualized Education Program in school, and outpatient counseling at the time of filing (Ex. B-7E). Handwritten notes received from Ms. Ortiz suggest that the claimant has ongoing serious issues at home with respect to caring for himself and concentration (Exs. B-9F, P. 3 translated in Ex. B-12F). Ms. Ortiz testified that the claimant has been living with her since he was born. She said he has some contact with his parents. She indicated that his room is messy, and he does not do chores or anything she asks him to do. She noted that he sometimes has friends. She said he sometimes argues with his sister, stated that he loses his temper, and said he gets upset if she sends him to do something. She further stated that he does not let her talk and tells her that she is dumb, stupid, and an old lady. She noted that her son tells the claimant to behave but after that moment, he forgets and does it again. She stated that the claimant takes medication as prescribed noting that she gives him his medications every morning before school and one at night to help him relax. She added that he does not refuse to take medications. She further noted that he does not get homework from school. Ms. Ortiz testified that he was in the partial program for the last two weeks and explained that he made a comment that he will kill his family and himself and that he is going to get a knife. She further stated that the claimant is able to dress himself but sometimes he does not want to change his clothes for a week. She stated that she has to tell him to shower, brush his teeth, and change his clothes. She indicated he does not want to cut his hair. She testified that he broke a wall and glass in the bathroom noting that he has outbursts almost every day. She noted that the next step after the partial program is an appointment with psychiatry. She testified that during the pandemic last year, she had trouble getting the claimant on the camera for school. She stated that he would sneak and go into YouTube or a game during last school year (Testimony).

Rebeka Caraballo, the claimant's aunt, indicated that the claimant has difficulty progressing in learning, interacting with others, caring for himself, and attending/completing tasks and did not report any physical deficits (Ex. B-3E). Ms. Caraballo testified that she sees the claimant 1-2 times a week at his house. She said the claimant likes to argue and wants to be right all the time. She indicated that the claimant loses his

14

temper and argues more often than others. She said he does not punch walls or hit things while she is there. She stated that he listens to her when she is there but is disrespectful to his grandmother when she is not there. She said the claimant is excited to see her when she comes over. She stated that after discharge from PPI the next step was a recommendation to go to an after-school program and a recommendation for a neuropsychological evaluation, noting that he is on a waiting list (Testimony).

The claimant testified that he lives with his grandmother and sister. He said he does not listen to his grandmother to do chores around the house, because he does not like to do anything. He stated that he hangs out with kids in his area at the park and playing football. He noted that he takes his medications as he is supposed to. He stated that medications make him sleepy. The claimant indicated that he gets angry with his grandmother and his sister stating that he throws or hits things mostly every time he gets mad and noted that this occurs mostly every day. He said he does not get homework to complete at home. He noted that his grades are "looking okay." He testified that he prefers having school in class rather than over the internet because of the pandemic. The claimant said he goes to church with his grandmother every Sunday. He further stated that he takes the bus to school. He noted that he will sometimes get angry at school but does not act out to teachers. He indicated that he attends the after-school program Wednesdays and Fridays for 3 hours. He stated that they teach them skills to do things at home, do crafts, and go to parks and added that he attends all of these sessions. He testified that he last went to school at Camp Curtin 15 days ago and explained that he was in a partial program for the last 15 days and was released the day of the hearing (Testimony).

(Tr. 54-55).

Following this hearing, on February 10, 2022, the ALJ issued a decision, denying Ortiz's application for SSI on behalf of B.C.B. (Tr. 43-59). The ALJ employed the three-step evaluation process to determine whether a child is eligible

for SSI payments by reason of disability. As part of this analysis the ALJ sequentially addressed: (1) whether the child was engaged in substantial gainful activity; (2) whether the child had a medically determinable, severe impairment; (3) whether the child's impairment or combination of impairments met, medically equaled, or functionally equaled an impairment listed in part B of 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 416.924.

In this decision, the ALJ first concluded that B.C.B. had not engaged in substantial gainful activity since February 19, 2019, the application date. (Tr. 51). At Step 2 of the sequential analysis, the ALJ found that the B.C.B. had the following severe impairments: learning disorder/borderline IQ, oppositional defiant disorder, and attention deficit hyperactivity disorder. (Id.) At Step 3 the ALJ determined that the claimant did not have an impairment or combination of impairments that met or medically equaled, or functionally equaled the severity of one of the listed impairments. (Tr. 52-58).

In reaching this result, the ALJ concluded that B.C.B. had a marked limitation in acquiring and using information. (Tr. 53). However, he further found that B.C.B. experienced no impairments in manipulating objects or physical well-being. (Tr. 53-54). As for B.C.B.'s functioning in the realms of attending and completing tasks, interacting with others, and the ability to care for himself, the ALJ found that he

16

displayed less than marked limitations. (Id.) The ALJ's decision justified each of these findings based upon the totality of the academic, clinical and medical opinion record, citing B.C.B.'s school performance, teacher appraisals, activities of daily living, and treatment records, all of which indicated that B.C.B.'s impairments were neither marked nor extreme. (Tr. 54-58). The ALJ also noted that these findings were consistent with the state agency expert opinions, which the ALJ deemed to be persuasive based upon the academic and clinical record. (Tr. 58). Having made these findings, the ALJ concluded that B.C.B. had not met the exacting standards for childhood disability and denied his claim. (Tr. 59).

This appeal followed. (Doc. 1). On appeal, the plaintiff contends that the ALJ's decision was not supported by substantial evidence. This matter has been fully briefed by the parties and is now ripe for resolution. As discussed in greater detail below, having considered the arguments of counsel and carefully reviewed the record under the deferential standard of review we are enjoyed to employ, the ALJ's decision will be affirmed.

## III.    Discussion

### A.    Child Disability Claims: Initial Burdens of Proof, Persuasion and Articulation for the ALJ

The legal standards which govern an ALJ's consideration of a childhood disability claim under the Act are familiar ones.

17

The Social Security Act provides that in order to qualify for disability benefits, a child must have "a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). The Commissioner has interpreted this statutory provision in regulations which provide that a child whose condition meets, medically equals, or functionally equals the criteria of a listed impairment must be found disabled. Similarly, a child whose impairment(s) do not meet or equal (medically or functionally) the listing criteria contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 is not disabled. 20 C.F.R. § 416.924(a).

Under these regulations, when determining the issue of functional equivalence to a listed impairment, there are six domains of functioning which an ALJ must consider: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving about and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). In order to establish a disabling level of functional equivalence to a listed impairment, an ALJ must conclude that a child exhibits either a "marked" limitation in two of these six domains, or an "extreme" limitation in any

single domain. 20 C.F.R. § 416.926a(d). The Commissioner defines a "marked" limitation as one which:

> [I]nterferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-today functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Marked' limitation also means a limitation that is 'more than moderate' but 'less than extreme.' It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2).

> The Commissioner then defines an "extreme" limitation as one which:

> [I]nterferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. 'Extreme' limitation also means a limitation that is 'more than marked.' 'Extreme' limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3).

## B.    <u>Substantial Evidence Review – the Role of this Court</u>

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the

record.  See 42 U.S.C. §405(g); <u>Johnson v. Comm'r of Soc. Sec.</u>, 529 F.3d 198, 200 (3d Cir. 2008); <u>Ficca v. Astrue</u>, 901 F.Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Pierce v. Underwood</u>, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason v. Shalala</u>, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." <u>Consolo v. Fed. Maritime Comm'n</u>, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is supported by substantial evidence the court must scrutinize the record as a whole." <u>Leslie v. Barnhart</u>, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency

factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
evidence standard, a court looks to an existing administrative record
and asks whether it contains "sufficien[t] evidence" to support the
agency's factual determinations. Consolidated Edison Co. v. NLRB,
305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis
deleted). And whatever the meaning of "substantial" in other contexts,
the threshold for such evidentiary sufficiency is not high. Substantial
evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks
omitted). It means—and means only—"such relevant evidence as a
reasonable mind might accept as adequate to support a conclusion."
Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v.
Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999)
(comparing the substantial-evidence standard to the deferential clearly-
erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

The question before this Court, therefore, is not whether the claimant is

disabled, but rather whether the Commissioner's finding that [she] is not disabled is

supported by substantial evidence and was reached based upon a correct application

of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205,

at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence") (alterations omitted); Burton v. Schweiker, 512

F.Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status

of a claim requires the correct application of the law to the facts"); see also Wright

v. Sullivan, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on

legal matters is plenary); Ficca, 901 F.Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014) (citing Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In Burnett, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

It is against these legal benchmarks that we assess the instant appeal.

### E.    The ALJ's Decision Will Be Affirmed.

In this setting, we are mindful that we are not free to substitute our independent assessment of the evidence for the ALJ's determinations. Rather, we must simply ascertain whether the ALJ's decision is supported by substantial evidence, a quantum of proof which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence," Pierce, 487 U.S. at 565, but rather "means— and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " Biestek, 139 S. Ct. at 1154. Judged against these deferential standards of review, we find that substantial evidence supported the ALJ's decision that D.J.A. was not entirely disabled.

The plaintiff first challenges the ALJ's decision not to address B.C.B.'s depressive disorder. In our view, this argument fails on several scores. At the outset, aside from the records from B.C.B.'s partial hospitalization in 2021 which note a

23

diagnosis of "MDD (major depressive disorder), single episode, moderate" (Tr. 918), the balance of his psychiatry and counseling records, including during his partial hospitalization, show that he repeatedly denied symptoms of depression throughout his treatment. (Tr. 100, 639, 685, 694, 696, 711, 907, 913, 926). As the Commissioner points out, "[i]t is well-established that a diagnosis alone cannot form the basis of disability." Tolan v. Kijakazi, No. 4:20-CV-1675, 2022 WL 905550, at *11 (M.D. Pa. Mar. 28, 2022) (citing 20 C.F.R. § 404.1525(d)); see also Yarrison v. Colvin, No. 1:15-CV-00683-YK-GBC, 2016 WL 4491858, at *6 (M.D. Pa. Aug. 2, 2016), report and recommendation adopted, No. 1:15-CV-683, 2016 WL 4479402 (M.D. Pa. Aug. 25, 2016) ("[O]bjective medical diagnoses alone are insufficient to establish severity at step two; a claimant must also present evidence that these limitations significantly limited his or her ability to do basic work activities or impaired his or her capacity to cope with the mental demands of working); Williams v. Colvin, No. 3:13-CV-2158, 2014 WL 4918469, at *9 (M.D. Pa. Sept. 30, 2014) ("A claimant must establish that a medically determinable impairment affects his or her functioning during the relevant period, and simply having a past history of impairment does not establish that the impairment is relevant to the claimant's case"). Indeed, where the omitted condition had no effect on the ALJ's ultimate conclusion regarding the sequential analysis of impairments under the regulations,

the Third Circuit has affirmed. Winters ex rel. Meinert v. Barnhart, 80 F. App'x 249, 252 (3d Cir. 2003).

Moreover, where the ALJ found several of B.C.B.'s mental impairments severe at Step Two, any error in failing to directly address this acute depression diagnosis would be harmless, Orr v. Comm'r Soc. Sec., 805 F. App'x 85, 88 (3d Cir. 2020), particularly where the ALJ analyzed B.C.B.'s psychological impairments and symptoms under listings which consider the same "paragraph B" criteria. (Tr. 52). Compare 20 C.F.R. Pt. 404 subpt. P, app. 1, § 112.04 (depressive disorders), to § 112.08 (personality and impulse-control disorders). See also Rembert v. Comm'r of Soc. Sec., 142 F. App'x 570, 572 (3d Cir. 2005) (affirming where the ALJ did not explicitly focus on any one listed impairment but reviewed and analyzed the record to support conclusion that claimant's impairments did not meet any of the listed impairments). Further, as previously noted, the plaintiff has failed to explain how this depression diagnosis would have affected the ALJ's analysis of the six domains of functioning or changed the outcome of the decision. See Winters ex rel, 80 F. App'x at 252.

Ortiz also incorporates several arguments into the overarching contention that the ALJ's analysis of the evidence was flawed, and the decision is not supported by substantial evidence. This attack on the ALJ's overall evaluation of the evidence

fails. As we have noted, an ALJ must consider six domains of functioning when making a childhood disability determination: (1) Acquiring and Using Information; (2) Attending and Completing Tasks; (3) Interacting and Relating with Others; (4) Moving about and Manipulating Objects; (5) Caring for Yourself; and (6) Health and Physical Well-Being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). A child can only be found disabled if the ALJ concludes the child exhibits either a "marked" limitation in two of these six domains, or an "extreme" limitation in any single domain. 20 C.F.R. § 416.926a(d). A "marked" limitation must "interfere[] seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(2). An "extreme" limitation, in turn, must "interfere[] very seriously with [the child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3).

In this case, while the academic, clinical, and opinion evidence confirms that B.C.B. faces some learning challenges related to his ADHD and unspecified learning disability, the ALJ properly accounted for any limitations in finding B.C.B. had a marked limitations in understanding, remembering, or applying information. The evidence simply did not reveal serious or very serious interference with B.C.B.'s ability to perform in the remaining realms of functioning. For example, as the ALJ pointed out, the evidence suggests that the behavioral issues reported at home are

not evident in the school setting, he is noted to be cooperative with treatment, interacts well with his teachers and peers, receives decent grades in school, had no real discipline problems, and a teacher questionnaire indicated he had no problems in attending and completing tasks. Further, there is no evidence he has any physical challenges. Finally, the ALJ's decision is fully supported by the opinions of four State agency consultants who all noted that B.C.B. exhibited less than marked or no limitations in all areas of functioning. Therefore, substantial evidence; that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, supported the ALJ's disability determination.

At bottom, it appears that the plaintiff is requesting that this court re-weigh the medical evidence and subjective testimony. This we may not do. See Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 359 (3d Cir. 2011) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) ("Courts are not permitted to re-weigh the evidence or impose their own factual determinations."); see also Gonzalez v. Astrue, 537 F.Supp.2d 644, 657 (D. Del. 2008) ("In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a *de novo* review of the Commissioner's decision and may not re-weigh the evidence of the record.") (internal citations omitted)). Rather, our task is simply to determine whether the ALJ's decision is supported by substantial evidence, a quantum of proof

which is less than a preponderance of the evidence but more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S. at 565. Finding that this deferential standard of review is met here, we conclude that a remand is not appropriate for the purpose of further assessing this opinion evidence.

In sum, on its merits the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting Hunter Douglas, Inc. v. NLRB, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case and recommend that this decision be affirmed.

28

## IV.    **<u>Conclusion</u>**

For the foregoing reasons, the decision of the Commissioner in this case will

be affirmed and the plaintiff's appeal denied.

An appropriate order follows.

*/S/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED:    December 19, 2024

29